UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------X

CARTAGENA ENTERPRISES, INC. d/b/a
CARTAGENA PUBLISHING; and RICO
RECORDS, LLC,

              **Plaintiffs,**

     - against -

J. WALTER THOMPSON COMPANY; J.
WALTER THOMPSON USA, INC.; J.
WALTER THOMPSON COMPANY
CARIBBEAN d/b/a JWT PUERTO RICO;
and BANCO POPULAR DE PUERTO
RICO,

              **Defendants.**

----------------------------------------------------X

**OPINION AND ORDER**

**13 Civ. 4238 (SAS)**



SHIRA A. SCHEINDLIN, U.S.D.J.:

# I.    INTRODUCTION

Plaintiffs Cartagena Enterprises Inc. d/b/a Cartagena Publishing ("Cartagena") and Rico Records, LLC ("Rico") have sued J. Walter Thompson Company ("JWT Co."), J. Walter Thompson USA, Inc. ("JWT USA"), J. Walter Thompson Company Caribbean d/b/a JWT Puerto Rico Inc. ("JWT Puerto Rico") (collectively "JWT Defendants") and Banco Popular de Puerto Rico ("Popular") (with JWT Defendants, "Defendants") for (i) copyright infringement under the U.S. Copyright Act and the Berne Convention for Protection of Literary and

Artistic Works and (ii) breach of contract.  Jurisdiction is based on the presence of a federal question, pursuant to 28 U.S.C. § 1331.   Defendants move to dismiss Cartagena's claims under Rule 12(b)(1) and compel arbitration, and to transfer Rico's claims to the United States District Court for the District of Puerto Rico. Alternatively, Defendants move to dismiss Rico's claims for lack of standing and failure to state a claim.

For the following reasons, Defendants' motions are granted.

## II.   BACKGROUND

### A.   Facts

Cartagena is a family-owned music publishing company that licenses the distribution and sale of musical compositions.[1]  Cartagena was formed under New York law with its principal place of business in New Jersey.[2]  Cartagena exclusively owns the copyrights to the musical composition "Y No Hago Más Ná" and has registered its copyright with the Register of Copyrights.[3]  Rico is a small, family-owned recording company that records, sells, and licenses the distribution

---

[1]   *See* Complaint ("Compl.") ¶ 10; Declaration of Ralph Cartagena ("Cartagena Decl.") ¶ 3.

[2]   *See* Compl. ¶ 4.

[3]   *See id.* ¶¶ 12-14.

and sale of sounds recordings.[4]  Rico is a New Jersey entity with its principal place of business in New Jersey.[5]  Rico exclusively owns the sound recordings for the albums "La Universidad de la Salsa" and "Salsa Classics Revisited," which both include recordings of "Y No Hago Más Ná," and has registered its copyrights for both albums with the Register of Copyrights.[6]  Rico exclusively owns the artwork for the album "Salsa Classics Revisited," and the registered copyrights to the sound recording for the album "Bailando con el Mundo," which includes a recording of "Don Goyo."[7]

JWT Puerto Rico is an advertising agency headquarted and operating in Puerto Rico.[8]  Popular, JWT Puerto Rico's client, is a financial institution formed under Puerto Rican law with its principal place of business in Puerto Rico.[9]

---

[4]      *See id.* ¶ 15; Cartagena Decl. ¶ 8.

[5]      *See* Compl. ¶ 5.

[6]      *See id.* ¶¶ 16, 18-20.

[7]      *See id.* ¶¶ 17, 22-24.

[8]      *See id.* ¶ 8.  JWT Puerto Rico and JWT USA are subsidiaries of JWT Co., but only JWT Puerto Rico is a party to the License Agreement.  *See id.* ¶¶ 28, 35-41.

[9]      *See id.* ¶¶ 9, 29.

On July 22, 2011, Cartagena and JWT Puerto Rico entered into a license agreement that allowed JWT Puerto Rico to create a derivative work of "Y No Hago Más Ná," titled "Echar Pa' Lante," as part the Popular advertising campaign.[10]  Under the License Agreement, Cartagena remained the owner of the copyrights to "Y No Hago Más Ná," and would become the sole owner of copyright interests in "Echar Pa' Lante" after the six-month license period ended.[11] Additionally, the License Agreement allowed JWT Puerto Rico to exploit "Echar Pa' Lante" only in certain media within Puerto Rico during the six-month Popular campaign.[12]  JWT Puerto Rico's only right with respect to "Y No Hago Más Ná," was to publish the lyrics in a newspaper in Puerto Rico one time during the license period.[13]  JWT Puerto Rico paid Cartagena $90,000 in exchange for the rights under the License Agreement.[14]

Section 10 of the License Agreement includes an arbitration clause that states:

Any claim or dispute that arises from or is related to the

---

[10]    *See id.* ¶¶ 35-37.

[11]    *See id.* ¶ 38.

[12]    *See id.* ¶ 39.

[13]    *See id.* ¶ 40.

[14]    *See id.* ¶ 42.

Agreement or the default thereof shall be resolved by arbitration in San Juan, Puerto Rico, in accordance with the rules and regulations obtained at that time from the panel governed by three members of the American Arbitration Association.  The parties to the Agreement agree to abide by the arbitration decision and the said decision may be reviewed by any court that has jurisdiction in Puerto Rico on the matter in question.[15]

Additionally, section 9 of the License Agreement states that "[the] Contract shall be governed by the laws of the Commonwealth of Puerto Rico applicable to copyright contracts and/or law including the Copyright Act."[16]

In October 2011, Cartagena informed JWT Puerto Rico that it had breached the License Agreement by (1) distributing "Echar Pa' Lante" to movie theaters throughout Puerto Rico; (2) using "Echar Pa' Lante" as Popular's telephone "on-hold" music; and (3) posting "Echar Pa' Lante" on soundcloud.com.[17]  JWT Puerto Rico denied the breaches and stated that it had ceased any alleged unauthorized uses.[18]  After the six-month license period ended, JWT Puerto Rico distributed video excerpts of "Echar Pa' Lante" and "Don Goyo" and cover art from "Salsa Classics Revisited" to numerous  advertising awards

---

[15]     Translated License Agreement, Ex. 2 to the Declaration of Marc J. Rachman in Support of JWT's Motion to Compel Arbitration and Transfer Venue ("Rachman Decl."), at 3.  The original License Agreement was drafted in Spanish.

[16]     *Id.*

[17]     *See* Compl. ¶ 44.

[18]     *See id.* ¶ 45.

organizations worldwide, which hosted the videos on their websites.[19]  In addition,

JWT Co., JWT Puerto Rico, and Popular posted the videos on their websites and

on social media sites.[20]

Plaintiffs filed their Complaint in the Southern District of New York,

seeking damages and injunctive relief based on (1) their copyright infringement

claims against Defendants; and (2) Cartagena's breach of contract claim against

JWT Puerto Rico.[21]

## III.   LEGAL STANDARD

### A.   Arbitrability

Arbitration clauses are subject to the Federal Arbitration Act

("FAA").[22]  "'[A]ny doubts concerning the scope of arbitrable issues should be

resolved in favor of arbitration.'"[23]   "'Accordingly, federal policy requires us to

---

[19]    *See id. ¶¶* 82-153.

[20]    *See id.* ¶¶ 154-174.  Popular posted only video excerpts of "Echar Pa'
Lante," not "Don Goyo."  *See id.* ¶¶ 161-174.

[21]    *See id.* ¶¶ 189-247.

[22]    *See Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 681
(2010).

[23]    *In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 128 (2d Cir. 2011)
(quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25
(1983)).

construe arbitration clauses as broadly as possible.'"[24]  Courts "will compel arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"[25] However, "[d]espite the 'liberal federal policy favoring arbitration agreements,' 'arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'"[26]

The Second Circuit applies a two-part test to determine the arbitrability of claims: "(1) whether the parties have entered into a valid agreement to arbitrate, and, if so, (2) whether the dispute at issue comes within the scope of the arbitration agreement."[27]

The Supreme Court has distinguished "questions of arbitrability," which are reserved for judicial resolution unless the parties have clearly agreed otherwise, from other "gateway matters," which are presumptively reserved for the

---

[24]     *Id.* (quoting *Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (brackets and internal quotation marks omitted)).

[25]     *Id.* (quoting *AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650 (1986)).

[26]     *Id.* at 127 (quoting *Moses H. Cone*, 460 U.S. at 24, and *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).

[27]     *Id.* at 127–28. The validity of the arbitration agreement is not in dispute.

arbitrator.[28]   "'Questions of arbitrability' is a term of art covering disputes about [1] whether the parties are bound by a given arbitration clause as well as disagreements about [2] whether an arbitration clause in a concededly binding contract applies to a particular type of controversy."[29]   Both disputes involve the arbitration agreement's scope.[30]   "'Those issues should be decided by the courts unless there is clear and unmistakable evidence from the arbitration agreement that the parties intended that they be decided by the arbitrator.'"[31]   Clear and unmistakable evidence includes the incorporation of the AAA Rules into a contract.[32]   Such a contractual agreement requires both parties to submit issues of arbitrability to the arbitrator.[33]

---

[28]     *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (citing *Howsam*, 537 U.S. at 83–85).

[29]     *VRG Linhas Aereas S.A. v. MatlinPatterson Global Opportunities Partners II L.P.*, 717 F.3d 322, 325 n.2 (2d Cir. 2013) (quoting *Republic of Ecuador*, 638 F.3d at 393).

[30]     *See id.*

[31]     *Id.* (quoting *Republic of Equador*, 638 F.3d at 393).

[32]     *See Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 898 F. Supp. 2d 610, 616 (S.D.N.Y. 2012) (citing *Contec Corp. v. Remote Solution, Co., Ltd.,* 398 F.3d 205, 208 (2d Cir. 2005).

[33]     *See Contec*, 398 F.3d at 208 (noting that AAA Rule 7(a) gives the arbitrator the power to rule on his or her own jurisdiction).

**B.    Rule 12(b)(1) Motion to Dismiss**[34]

Rule 12(b)(1) provides for the dismissal of a claim when the federal court lacks jurisdiction over the subject matter.  "'The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence.'"[35]  In considering a motion to dismiss for lack of subject matter jurisdiction, the court must assume the truth of the material facts alleged in the complaint.[36]  However, "'[j]urisdiction must be shown affirmatively, and that showing is not made by

---

[34]    "There is a 'lack of clarity in the case law of this Circuit (and others) as to what procedural mechanism must be employed by courts to dismiss actions in which the parties are bound to resolve (or attempt resolution of) their claims in accordance with a contractual grievance procedure, such as an agreement to arbitrate.'"  *Sleepy's LLC v. Escalate, Inc.*, No. 10 Civ. 1626, 2010 WL 2505678, at *1 n.15 (S.D.N.Y. June 18, 2010) (quoting *Tyler v. City of New York*, No. 05 Civ. 3620, 2006 WL 1329753, at *2 (E.D.N.Y. May 16, 2006) (cataloging cases and secondary texts).  *Accord Rosenhoff Ltd. v. Cataclean Americas, LLC,* No. 12 Civ. 1143A, 2013 WL 2389725, at *5 (W.D.N.Y. May 30, 2013) (resolving motion to compel arbitration under Rule 12(b)(1)).  Because Plaintiffs do not contest Defendants' invocation of Rule 12(b)(1), the Court will proceed using that standard.

[35]    *Al-Khazraji v. United States*, 519 Fed. App'x 711, 713 (2d Cir. 2013) (quoting *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012) (internal quotation marks omitted)).

[36]    *See Hijazi v. Permanent Mission of Saudi Arabia to United Nations*, 403 Fed. App'x 631, 632 (2d Cir. 2010) (citing *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir. 2006)).

drawing from the pleadings inferences favorable to the party asserting it.'"[37]  In fact, "in dismissing a complaint for lack of subject-matter jurisdiction under Rule 12(b)(1), a court 'may refer to evidence outside the pleadings.'"[38]

### C.     Motion to Transfer Venue

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought. . . ."  In order to transfer an action under section 1404(a), the moving party must satisfy two requirements.[39]  *First*, the transferee court must have jurisdiction over the parties and must be an appropriate venue for the action.[40]  *Second*, the balance of justice and convenience must favor transfer.[41]  The second requirement "'is essentially an

---

[37]     *Jordan v. Verizon Corp.*, 391 Fed. App'x 10, 12 (2d Cir. 2010) (quoting *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (internal quotation marks omitted)).

[38]     *Burfeindt v. Postupack*, 509 Fed. App'x 65, 67 (2d Cir. 2013) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).

[39]     *See Markel v. Sweeney*, No. 12 Civ. 3555, 2012 WL 2930194, at *5 (S.D.N.Y. July 9, 2012) (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29-30 (1988)).

[40]     *See id.*

[41]     *See id.*

equitable task' left to the Court's discretion."[42]  District courts have "wide

discretion to adjudicate motions for transfer according to an 'individualized,

case-by-case consideration of convenience and fairness.'"[43]  The burden is on the

movant to show that transfer is warranted.[44]

　　　　　To determine whether transfer is warranted, the court considers: (1)

the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of

relevant documents and ease of access to sources of proof, (4) the convenience of

the parties, (5) the locus of operative facts, (6) availability of process to compel the

attendance of unwilling witnesses, (7) the relative means of the parties, (8) the

forum's familiarity with the governing law, and (9) trial efficiency and the interest

of justice, based on the totality of the circumstances.[45]

## IV.　DISCUSSION

---

[42]　*Id.* (quoting *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 80 (2d Cir. 1989)).

[43]　*Thyssenkrupp Materials N.A., Inc. v. M/V Fed. Shimanto*, No. 13 Civ. 1543, 2013 WL 3947749, at *2 (July 30, 2013) (quoting *Stewart*, 487 U.S. at 29).

[44]　*See Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).

[45]　*See Fellus v. Sterne, Agee & Leach, Inc*., 783 F. Supp. 2d 612, 617 (S.D.N.Y. 2011); *see also D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 106-07 (2d Cir. 2006) (listing factors 1–7 as "some" of the factors to consider).

### A.    Arbitrability of Cartagena's Claims[46]

Cartagena does not dispute that its breach of contract claim should be arbitrated.[47]  As to Cartagena's copyright claims, the Court must first determine the threshold issue of whether the Court or the arbitrator will decide arbitrability.[48] Here, there is "clear and unmistakable evidence" that the parties intended the

---

[46]    The License Agreement contains a choice-of-law provision, stating that the License Agreement is governed by Puerto Rican law.  *See* Translated License Agreement at 3.  However, it is not clear from the face of the License Agreement that the parties intended Puerto Rican law to apply to the threshold question of who decides arbitrability.  "Unless parties have objectively done so, courts have been reluctant to apply a choice-of-law provision to such an inquiry, as it concerns 'the allocation of power between courts and arbitrators.'"  *Holzer v. Mandadori*, No. 12 Civ. 5234, 2013 WL 1104269, at *6 (S.D.N.Y. Mar. 14, 2013) (quoting *FR 8 Singapore Pte. Ltd. v. Albacore Maritime Inc.*, 794 F. Supp. 2d 449, 453 (S.D.N.Y. 2011)).  *Accord National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 134–35 (2d Cir. 1996) (quoting *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 60 (1995)).  Thus, federal law should govern the question of who decides abitrability.  *See Holzer*, 2013 WL 1104269, at *6 (applying federal arbitrability law to the question of who decides despite a choice-of-law provision that required the contract to be construed under Dubai law); *Jesus-Santos v. Morgan Stanley Dean Witter Inc.*, No. Civ. 05-1336, 2006 WL 752997, at *6 (Mar. 22, 2006) (applying federal, rather than Puerto Rican law, to the question of who decides arbitrability).

[47]    *See* Plaintiffs' Memorandum of Law in Opposition to (i) JWT Defendants' Motion to Compel Arbitration and to Transfer Any Remaining Claims to the District of Puerto Rico or in the Alternative, Stay Any Such Remaining Claims and (ii) Popular's Motion to Dismiss and Transfer Venue ("Opp. Mem.") at 16.

[48]    *See VRG Linhas Aereas S.A.*, 717 F.3d at 324 ("The question of *who* is to decide whether a dispute is arbitrable is one that must necessarily precede the question of *whether* a dispute is arbitrable.").

arbitrator to decide the issue of arbitrability.[49]  *First*, the parties incorporated the AAA rules into their Agreement.[50]  The Second Circuit has held that parties who incorporate AAA rules into their Agreement are assenting to arbitrate issues of arbitrability.[51]  Thus, AAA Rule R–7(a), allowing the arbitrator to determine her own jurisdiction, governs.[52]  *Second*, the parties' intent to arbitrate the question of arbitrability is evidenced by the language of the arbitration clause.  The License Agreement states that "[a]ny claim or dispute that arises from or is related to the Agreement . . . shall be resolved by arbitration."[53]  The Second Circuit has held that a contract that refers "any and all" controversies to arbitration reflects a "broad grant of power to the arbitrators"  and evinces the parties' clear "inten[t] to

---

[49]     *See Republic of Ecuador*, 638 F.3d at 393 (citing *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir.2002)).

[50]     *See* Translated License Agreement at 3.

[51]     *See Schneider v. Kingdom of Thailand*, 688 F.3d 68, 72 (2d Cir. 2012); *Contec*, 398 F.3d at 211.  *See also VRG Linhas Aereas S.A.*, 717 F.3d at 326 ("[A]n arbitration clause subjecting disputes to the rules and procedures of the ICC International Court of Arbitration clearly and unmistakably commits to arbitration any questions about the arbitrability of particular disputes.").

[52]     *See* AAA Rule R-7(a) ("The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.").

[53]     Translated License Agreement at 3.

arbitrate issues of arbitrability."[54]

However, a question remains whether the parties also intended to permit Popular, a non-signatory to the License Agreement, to compel the arbitration of arbitrability issues.[55]  "When a non-signatory moves to compel arbitration of arbitrability, the language of the arbitration clause itself may clarify whether the parties in fact intended to delegate that threshold question to the arbitrator."[56]  However, even where an arbitration clause is limited to disputes "between the parties," a non-signatory may be able to compel arbitration of arbitrability issues.[57]  Under equitable estoppel, a non-signatory may compel a

---

[54]   *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 121 (2d Cir. 2003) ("[B]ecause the parties' arbitration agreement is broadly worded to require the submission of 'all disputes' concerning the Representation Agreement to arbitration, and . . . for arbitration to be conducted under the rules of the ICC, which assign the arbitrator initial responsibility to determine issues of arbitrability, . . . the agreement clearly and unmistakably evidences the parties intent to arbitrate questions of arbitrability.").

[55]   Cartagena fails to raise this issue directly, arguing only that Popular cannot compel Rico to arbitrate because both are non-signatories.  *See* Opp. Mem. at 12. The point is moot because Defendants do not seek to compel Rico to arbitrate.

[56]   *Holzer*, 2013 WL 1104269, at *8 (citing *Contec*, 398 F.3d at 209 (noting that a signatory's agreement to arbitrate issues of arbitrability with another signatory does not necessarily indicate its intent to arbitrate the same issues with a non-signatory));  *Republic of Iraq v. BNP Paribas USA*, 472 Fed. App'x 11, 12–13 (2d Cir. 2012).

[57]   *See Contec*, 398 F.3d at 210.

signatory to arbitrate a dispute where "a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them disclose[ ] that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'"[58]  This does not mean, however,

> that whenever a relationship of any kind may be found among the parties to a dispute and their dispute deals with the subject matter of an arbitration contract made by one of them, that party will be estopped from refusing to arbitrate . . . .  [I]n addition to the "intertwined" factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement.[59]

Here, nothing in the first sentence of the arbitration clause, agreeing to resolve "[a]ny claims or dispute that arises from or is related to the Agreement" by arbitration, limits arbitration to the parties.[60]  Limiting language is found only in the second sentence: "*[T]he parties to the Agreement agree to abide by the*

---

[58]   *Ragone v. Atlantic Video at Manhattan Ctr.*, 595 F.3d 115, 126-27 (2d Cir. 2010) (quoting *Choctaw Generation Ltd. P'ship v. American Home Assurance Co.*, 271 F.3d 403, 406 (2d Cir. 2001)).

[59]   *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 359 (2d. Cir.2008).

[60]   *See* Translated License Agreement at 3.

-15-

arbitration decision . . . ."[61]  Nevertheless, the principle of equitable estoppel allows Popular to compel arbitration of the arbitrability issue.

The equitable estoppel test is necessarily fact-specific.  In *Ragone v. Atlantic Video at Manhattan Center*, the plaintiff, an employee of a television production company, was estopped from avoiding arbitration of her claims against ESPN, a client of the television production company.[62]  The plaintiff argued that the arbitration clause in her employment agreement with the television production company did not require her to arbitrate disputes with ESPN, a non-signatory.[63] The Second Circuit disagreed and held that the plaintiff was estopped from avoiding arbitration with ESPN because she clearly understood ESPN to be her "co-employer" when she entered into the agreement, was hired to provide services to ESPN, and treated ESPN effectively as her employer.[64]

Cartagena is similarly estopped from avoiding arbitration with Popular.  *First*, Cartagena's claims against Popular are clearly intertwined with

---

[61]     *Id.*

[62]     *See* 595 F.3d at 126–27.

[63]     *See id.* at 127.

[64]     *See id.*; *Astra Oil Co., Inc. v. Rover Navigation, Ltd.*, 344 F.3d 276, 280-81 (2d Cir. 2003).

Cartagena's claims against JWT Puerto Rico.  Cartagena alleges that, "[i]n addition to the infringing Videos produced and distributed by JWT, JWT Puerto Rico and Popular, Popular also distributed videos [] that breached the License Agreement and infringed Cartagena's copyright . . . ."[65]  The issue is the same: whether or not Defendants breached the terms of the License Agreement and infringed Cartagena's copyright by distributing and posting the videos.  Although Cartagena's breach of contract claim is technically directed only against JWT Puerto Rico, Cartagena's claims against Popular are factually intertwined with the subject matter of the License Agreement.  In fact, Cartagena *treats* Popular as a signatory to the License Agreement by alleging that Popular breached it.[66]

>        *Second*, the parties' close relationship supports the application of equitable estoppel.  The License Agreement states that "Y no hago mas na" was created for an advertising campaign for one of JWT Puerto Rico's clients.[67]  The Complaint identifies the client as Popular.[68]  Furthermore, under the License Agreement's "Terms and Conditions," the parties refer to the "promotional

---

[65]        Compl. ¶ 161.

[66]        *See id.* ¶ 161-173.

[67]        *See* Translated License Agreement at 1.

[68]        *See* Compl. ¶ 31.

-17-

materials of the Bank" in "BPPR branches," and BPPR's website and Facebook

page.[69]  This is not a case where Popular is a "stranger" to the contract or where the

signatories did not intend Popular to be a party to the contract.[70]  Instead,

Cartagena entered into the License Agreement with JWT Puerto Rico, intending to

bind Popular to the License Agreement's terms.  Just as the plaintiff in *Ragone*

treated ESPN as her co-employer, Cartagena treated Popular as its co-licensee.

Thus, Cartagena is compelled to arbitrate the issue of arbitrability with

Defendants.[71]

---

[69]      *See* Translated License Agreement at 2.  "BPPR" is a well-known acronym for Banco Popular de Puerto Rico.  Popular is thus, "textually linked" to the contract.  *See* Popular's Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and for Transfer of Venue under 28 U.S.C. § 1404(a) ("Popular Mem.") at 7.

[70]      *Cf. Ross v. American Express Co.*, 547 F.3d 137, 148 (2d Cir. 2008) (holding that a non-signatory could not compel arbitration with plaintiffs where it was "a complete stranger to the plaintiffs' [contracts], [] did not sign them, [] is not mentioned in them, and [] performs no function whatsoever relating to their operation."); *Republic of Iraq*, 472 Fed. App'x at 13 (holding that non-signatory could not compel signatory to arbitrate where language of arbitration clause was limited to the "parties," there was no business relationship between non-signatory and signatories, and signatories did not conduct themselves as if they had a contract with non-signatory).

[71]      The other non-signatory Defendants, JWT Co. and JWT USA, may also compel Cartagena to arbitrate.  *See JLM Indus. Inc.v. Stolt-Nielsen SA*, 387 F.3d 163, 178 (2d Cir. 2004) (holding that non-signatory parent company could compel arbitration based on agreement signed by subsidiary); *Astra Oil Co., Inc.*, 344 F.3d at 280 (compelling arbitration where plaintiff treated non-signatory corporate affiliate as a signatory).

### B.     Transfer of Rico's Claims

Defendants next move to transfer Rico's claims to the District of Puerto Rico.[72]   As to the first requirement under section 1404(a), Plaintiffs could have brought this action in the District of Puerto Rico, which has subject matter jurisdiction over copyright infringement claims.[73]   JWT Puerto Rico and Popular are located in Puerto Rico and a substantial part of the events giving rise to the claims occurred there.[74]   Rico does not argue that its action could not have been brought in Puerto Rico, only that the Southern District of New York is "a proper forum."[75]

As to the second requirement — convenience and justice — the

---

[72]     Contrary to Plaintiffs' assertion, Defendants do not move to compel arbitration of Rico's claims.  *See* Reply Memorandum of Law in Further Support of JWT Defendants Motion to Compel Arbitration and to Transfer Venue ("JWT Def. Reply") at 4 n.2; Popular's Reply in Support of its Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) and for Transfer of Venue under 28 U.S.C. 1404(A) ("Popular Reply") at 2 n.2.

[73]     *See* 28 U.S.C. § 1338(a).

[74]     *See id.* § 1391(b)(2) (stating that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."); *id.* § 1400(a) ("Civil actions, suits, or proceedings arising under any Act of Congress relating to copyrights or exclusive rights in mask works or designs may be instituted in the district in which the defendant or his agent resides or may be found.").

[75]     *See* Opp. Mem. at 18-19.

balance of factors favor transfer.  *First*, Rico will not be inconvenienced by the transfer.  After Cartagena's claims are sent to the arbitrators in Puerto Rico, only Rico will remain in this district.  Because Rico is based in New Jersey, its forum choice should be given little weight, regardless of whether its preferred attorney is licensed in New York.[76]  The Cartagena family owns both Rico and Cartagena, and Cartagena has signed a License Agreement, stating that it will arbitrate all disputes arising from or relating to the License Agreement *in Puerto Rico*.[77]  Thus, Rico cannot plausibly claim that the transfer to Puerto Rico would be inconvenient.

  *Second*, the convenience and availability of the witnesses and the evidence favor transfer.  Convenience of the witnesses is considered the most important factor.[78]  All of JWT-Puerto Rico's witnesses that designed, developed, and distributed the videos for the Popular advertising campaign are in Puerto

---

[76] *See Legrand v. City of New York*, No. 09 Civ. 9670, 2010 WL 742584, at *2 (S.D.N.Y. Mar. 3, 2010) (A plaintiff's forum choice is accorded less deference "where the forum is not the plaintiff's home and the cause of action did not arise in the forum.") (citing *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001)).

[77] *See* Translated License Agreement at 3; *see also* Cartagena Decl. ¶¶ 2, 3, 8.

[78] *See Randle v. Alexander*, No. 10 Civ. 9235, 2013 WL 2358601, at *22 (S.D.N.Y. May 30, 2013); *see also Filmline (Cross–Country) Prods., Inc. v. United Artists Corp.*, 865 F.2d 513, 520 (2d Cir. 1989).

Rico.[79]  Popular's witnesses who worked on the publicity campaign are all in

Puerto Rico.[80]  Additionally, third-party witnesses, such as the Puerto Rican

musical group that recorded the original "Y No Hago Más Ná" and "Echar Pa'

Lante" are based in Puerto Rico.[81]  By contrast, Rico's potential New York-based

witnesses all lack personal knowledge of the material facts.[82]  Rico plans to depose

JWT Company's Chairman and CEO, Bob Jeffrey, who was involved in the

creation of a video that documents successful JWT campaigns.[83]  However, Jeffrey

has no personal knowledge of the creation of the video, he merely narrated a few

statements in the video while in Puerto Rico.[84]  Rico also seeks to depose a Sarah

---

[79]     *See* Declaration of Jorge Rodriguez ("Rodriguez Decl.") ¶¶ 5, 10.

[80]     *See* Reply Affidavit of Mariel Arraiza-Antonmattei ("Arraiza-Antonmattei Decl.") ¶¶ 1-3.

[81]     *See* Memorandum of Law in Support of JWT Defendants' Motion to Compel Arbitration as to the Claims by Cartagena and to Transfer Remaining Claims to the District of Puerto Rico, or in the Alternative, Stay Any Such Remaining Claims ("JWT Def. Mem.") at 18.

[82]     *See* JWT Def. Reply at 5-7.

[83]     *See* Opp. Mem. at 23-24.

[84]     *See* Declaration of Jaime Rosado ("Rosado Decl.") ¶ 9; *Caldwell v. Slip-N-Slide Records, Inc.*, No. 10 Civ. 9106, 2011 WL 3251502, at *2 (S.D.N.Y. July 26, 2011) (noting that the locus of operative facts in infringement case is typically "where the allegedly infringing product was designed and developed").

Seigel — a blogger — and Ralpha Cartagena's two sons, none of whom have personal knowledge of the alleged infringment.[85]  Rico's other potential witness, Jaime Rosado, JWT Puerto Rico's Vice President Regional Creative Director, is located in Puerto Rico.[86]  Moreover, nearly all relevant evidence is located in Puerto Rico, *e.g.*, documents concerning the advertising campaign and the infringing videos, copies of infringing videos, and JWT-Puerto Rico's communications with Cartagena and Rico.[87]

      *Third*, the locus of operative facts is clearly in Puerto Rico, where the infringing videos were created and distributed to the advertising awards committees.[88]

      *Fourth*, the remaining factors — the relative means of the parties, the forum's familiarity with the governing law, and trial efficiency — favor transfer. Federal courts are presumed to be "equally familiar" with the law in federal copyright infringement actions, and Puerto Rican law governs the construction of

---

[85]    *See* Opp. Mem. at 25.

[86]    *See* Rosado Decl. ¶¶ 3-4.

[87]    *See*  JWT Def. Mem. at 20; Popular Mem. at 19.

[88]    *See* Opp. Mem. at 20.

the License Agreement.[89]  Although Plaintiffs have submitted tax forms, they have

not demonstrated that litigating in Puerto Rico would be "unduly burdensome."[90]

Finally, trial efficiency and the interest of justice favor transfer because Plaintiffs

do business in Puerto Rico, agree to resolve disputes in Puerto Rico, and will be

traveling to Puerto Rico to determine the arbitrability of Cartagena's claims.[91]

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Cartagena's

claims and transfer Rico's claims is GRANTED.  The Clerk of the Court is directed

to close these motions [Docket Nos. 12, 17] and this case.


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            October 16, 2013

---

[89]      *See Colour & Design v. U.S. Vinyl Mfg. Corp.*, No. 04 Civ. 8332, 2005 WL
1337864, at *4 (S.D.N.Y. June 3, 2005).

[90]      *See* Cartagena Decl. ¶¶ 5, 10.

[91]      *See* JWT Def. Reply at 9.

-23-

**- Appearances -**

**For Plaintiffs:**

Nicole Haff, Esq.
Roger Juan Maldonado, Esq.
Balber, Pickard, Battistoni, Maldonado, & Van Der Tuin, P.C.
1370 Avenue of the Americas
New York, NY 10019
(212) 246-2400

**For JWT Defendants:**

C. Andrew Keisner, Esq.
Marc J. Rachmann, Esq.
Davis & Gilbert, L.L.P.
1740 Broadway
New York, New York 10019
(212) 468-4800

**For Defendant Popular:**

Raymond J. Dowd, Esq.
Dunnington, Bartholow & Miller, L.L.P.
1359 Broadway, Suite 600
New York, New York 10018
(212) 682-8811